Carolyn D. Richmond, Esq.
Ernest Edward Badway, Esq.
Glenn S. Grindlinger, Esq.
Fox Rothschild LLP
101 Park Avenue, Suite 1700
New York, New York 10178
Telephone: (212) 878-7900
Facsimile: (212) 692-0940
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STANDARD INTERNATIONAL MANAGEMENT, LLC, STANDARD HIGH LINE EMPLOYER, LLC, and STANDARD EAST VILLAGE EMPLOYER, LLC<br><br>Plaintiffs,<br><br>v.<br><br>UKG INC.,<br><br>Defendant. | **Case No. _____**<br><br>**COMPLAINT** |

Plaintiffs Standard International Management, LLC ("SIM"), Standard High Line Employer, LLC ("High Line"), and Standard East Village Employer, LLC ("East Village" and collectively with SIM and High Line, "Plaintiffs"), by and through its attorneys, Fox Rothschild LLP, hereby file this Complaint against Defendant UKG Inc. ("Defendant"), and state as follows:

**INTRODUCTION**

1.     Plaintiffs assert Defendant has breached its contract for indemnification as it relates to the Defendant's provision of payroll services to Plaintiffs in connection with the two class actions brought against the Plaintiffs. SIM, High Line, and East Village relied upon Defendant to

provide payroll services and prepare wage statements[1] that complied with applicable law.  As a result of Defendant's failure to provide wage statements that complied with New York law, SIM, High Line, and East Village have been damaged.  SIM, High Line, and East Village have repeatedly contacted the Defendant seeking recompense for their misrepresentations, breach of their contractual obligations in a reasonable and legally compliant manner and to indemnify Plaintiffs for their losses associated therewith.   However, Defendant has failed and/or refused to assume any responsibility for the improper wage statements that they prepared for High Line and East Village employees and the underlying class action claims, which are described below. Accordingly, Plaintiffs now are compelled to bring this Complaint against Defendant.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between each Plaintiff and Defendant, and the amount in controversy in this action exceeds $75,000.00, exclusive of interest and costs.

3.      This Court has personal jurisdiction over the Defendant because Defendant regularly transacts and conducts business in New York. And, upon information and belief, Defendant prepared the wage statements at issue in New York.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred within the geographic jurisdiction of this Court.

## PARTIES

5.      SIM is a Delaware limited liability company authorized to do business in New York, with a principal place of business located at 23 East 4th Street, 5th Floor, New York, New

---

[1] For purposes of this Complaint, the terms "wage statement", "pay stub", and "paystub" are used interchangeably.

York 10003.  SIM is an entity that, among other things, manages and operates hotels under the "Standard" brand name, including The Standard, High Line, a hotel located at 848 Washington Street, New York, New York 10014 ("High Line Hotel"), and The Standard, East Village, a hotel located at 25 Cooper Sq, New York, New York 10003 ("East Village Hotel").

6.      High Line is a Delaware limited liability company authorized to do business in New York, with a principal place of business located at 848 Washington Street, New York, New York 10014.  High Line is an entity that employs the individuals who work at the High Line Hotel.  SIM and High Line are affiliated entities.

7.      East Village is a Delaware limited liability company authorized to do business in New York, with a principal place of business located at 25 Cooper Sq, New York, New York 10003.  East Village is an entity that employs the individuals who work at the East Village Hotel. SIM and East Village are affiliated entities

8.      Defendant is a Delaware corporation, with, upon information and belief, a principal place of business located at 200 Ultimate Way, Weston, Florida 33326.

## STATEMENT OF FACTS

**Background**

9.      SIM entered into an agreement with Defendant to provide payroll services for the employees of SIM and its related entities, including High Line and East Village.

10.     Pursuant to SIM's agreement with the Defendant, Defendant agreed to process the payroll for the employees of SIM and its affiliated entities and issue paychecks and wage statements to such employees.  The agreements contain representations and/or covenants regarding compliance with applicable laws.

130239526.7

11.    Defendant specifically agreed to indemnify, among others, SIM and its affiliated entities, including High Line and East Village, for any losses they may suffer as a result of Defendant's failure to comply with applicable law.

12.    SIM specifically relied upon this indemnification language in electing to engage Defendant to provide paychecks and other services for SIM and its affiliated entities.  In fact, the indemnification language was the subject of long and protracted negotiations between SIM and Defendant.

13.    Throughout the relevant time period, the High Line Hotel operated a full-service restaurant known as The Standard Grill.  All of the employees who work (or have worked) at The Standard Grill are (or were) employed by High Line.

14.    Brian "Geno" Nettle is a former employee of High Line who worked as a Server at The Standard Grill.  Nettle was employed by High Line from April 7, 2015 until April 9, 2016.  Guilherme Parreiras is a former employee of High Line who worked as a Server at The Standard Grill.  Parreiras was employed by High Line from December 23, 2013 until March 24. 2016.

15.    As is typical for a full-service restaurant, The Standard Grill employed numerous employees in front-of-house and back-of-house positions, including employees in tipped positions. Throughout the relevant time period, The Standard Grill also employed hundreds of employees, including front-of-house, non-managerial employees in tipped positions such as servers, runners, bussers, and bartenders.

16.    On or about January 15, 2021, Brian "Geno" Nettle and Guilherme Parreiras filed a Class and Collective Action Complaint ("Nettle Complaint") in the Supreme Court of the State of New York, King County, bearing Index Number 501183/2021, against High Line ("Nettle

Action").  The Nettle Complaint is annexed hereto as Exhibit 1 and incorporated by reference herein

17.     Throughout the relevant time period, the East Village Hotel operated a full-service restaurant known as Narcissa.  All of the employees who work (or have worked) at Narcissa are (or were) employed by East Village.

18.     Meghan Rotolo is a former employee of East Village who worked as a Server at Narcissa before she was promoted to Manager.  Rotolo was employed by East Village from December 14, 2015 until February 8, 2018.

19.     As is typical for a full-service restaurant, Narcissa employed numerous employees in front-of-house and back-of-house positions, including employees in tipped positions. Throughout the relevant time period, Narcissa also employed hundreds of employees, including front-of-house, non-managerial employees in tipped positions such as servers, runners, bussers, and bartenders.

20.     On or about July 30, 2021, Meghan Rotolo filed a Class and Collective Action Complaint ("Rotolo Complaint") in the Supreme Court of the State of New York, King County, bearing Index Number 519116/2021, against East Village ("Rotolo Action").  The Rotolo Complaint is annexed hereto as Exhibit 2 and incorporated by reference herein.

**New York Wage and Hour Legal Framework**

21.     New York law requires that employers provide their employees with wage statements with every payment of wages.  On December 10, 2010, New York State enacted the Wage Theft Prevention Act ("WTPA").  The WTPA became effective on April 9, 2011.  The WTPA amended Section 195 of the New York Labor Law.  Among other things, the WTPA requires that wage statements provided to employees contain certain information.  Section 195(3)

130239526.7

of the New York Labor Law requires that wage statements list "[a]llowances, if any, claimed as part of the minimum wage[.]"

22.     The New York Hospitality Industry Wage Order sets forth additional requirements for employers in the hospitality industry, including requirements regarding the issuance of wage statements.  Section 146-2.3 of the New York Hospitality Industry Wage Order requires that wage statements list "credits claimed (for tips …) if any …."

23.     Courts have interpreted New York law to require wage statements issued to employees, whose wages are subject to a tip credit, to expressly identify the per hour amount of the tip credit and the total amount of the tip credit allowance.  *See, e.g., Khereed v. W. 12th St. Rest. Grp. LLC*, No. 15-CV-1363 (PKC), 2016 WL 590233 (S.D.N.Y. Feb. 11, 2016).

24.     Since February 2015, pursuant to Section 198(1-d), the failure to provide wage statements in accordance with New York law can result in a penalty up to $250 per work day up to a maximum of $5,000 per employee.  From April 9, 2011 until February 2015, pursuant to Section 198(1-d), the failure to provide wage statements in accordance with New York law could result in a penalty up to $100 per workday up to a maximum of $2,500 per employee.

**Defendant Contracted to Provide Payroll Services, Follow the Law, and Indemnify Plaintiffs**

25.     To ensure that High Line, East Village, and their affiliated entities' employees would be compensated properly and in full compliance with all applicable federal and state laws, SIM's predecessor-in-interest sought to engage a company that specialized in payroll processing.

26.     Accordingly, SIM's predecessor-in-interest engaged in lengthy negotiations and discussions with Defendant in 2012.  On September 28, 2012, HotelsAB, LLC, the predecessor-

130239526.7

in-interest to SIM, entered into a SAAS Model Agreement with The Ultimate Software Group, Inc.[2] ("SAAS Agreement").

27.    Pursuant to the SAAS Agreement, Defendant agreed to provide various services related to the calculation of payrolls and the preparation of related vouchers and checks.

28.    Pursuant to the SAAS Agreement, among other things, Defendant agreed that it would provide wage statements to, among others, the employees of HotelsAB, LLC, predecessor-in-interest to SIM, as well as affiliates of HotelsAB, which includes High Line.

29.    Pursuant to the SAAS Agreement, among other things, Defendant represented and warranted that "it will abide by all laws, rules and regulations [and Defendant] represents and warrants that the products and services shall comply with all applicable laws and regulations . . .and Defendant shall update the products and services on a timely basis as required to maintain compliance therewith at all times[.]"

30.    Pursuant to the SAAS Agreement, among other things, Defendant agreed to "indemnify and hold [SIM] and its Affiliates, hotel owners, and its and their Affiliates, parents, subsidiaries, employees, officers, agents, principals, and related parties (collectively "Indemnified Parties") harmless from any loss, cost, expense (including, without limitation, reasonable attorneys' fees), property damage, interest or penalty incurred by such Indemnified Parties from any third party, employee, or taxing jurisdiction based upon [Defendant's] failure to perform the Services in accordance with applicable law or regulation (inclusive of applicable tax laws or regulations), gross negligence or willful misconduct . . . that results in any claim, penalty, interest,, cost, or expense incurred by such Indemnified Parties[.]" (hereinafter "Indemnity Clause").

---

[2] On or about October 1, 2020, The Ultimate Software Group, Inc. rebranded itself as UKG Inc. *See* https://www.ultimatesoftware.com/PR/Press-Release/Kronos-and-Ultimate-Software-Unveil-Plans-to-Rebrand-as-and-8220UKG-and-8221 (visited on February 8, 2022)

31.    On February 21, 2013, HotelsAB, LLC, predecessor-in-interest to SIM, and Defendant entered into an Addendum to the SAAS Agreement.  This Addendum did not alter or modify, Defendant's obligations to provide wage statements that comply with applicable law nor did it modify the aforementioned Indemnity Clause.

32.    On August 30, 2013, HotelsAB, LLC assigned all of its interest in the SAAS Agreement and the Addendum to the SAAS Agreement to SIM.

33.    On December 12, 2013, SIM and Defendant entered into a Second Addendum to the SAAS Agreement.  This Second Addendum did not alter or modify, Defendant's obligations to provide wage statements that comply with applicable law nor did it modify the Indemnity Clause.

34.    On April 29, 2016, SIM entered into a second SAAS Model Agreement with Defendant, which was amended on July 25, 2016 and amended a second time on August 23, 2017 (collectively, the "Second SAAS Agreement").

35.    Pursuant to the Second SAAS Agreement, Defendant agreed to provide various services related to the calculation of payrolls and the preparation of related vouchers and checks.

36.    Pursuant to the Second SAAS Agreement, among other things, Defendant agreed that it would provide wage statements to, among others, the employees of SIM as well as affiliates of SIM, which includes High Line and East Village.

37.    Pursuant to the Second SAAS Agreement, among other things, Defendant agreed that "it will abide by all laws, rules and regulations [and Defendant] represents and warrants that the products and services shall comply with all applicable laws and regulations . . .and Defendant shall update the products and services on a timely basis as required to maintain compliance therewith at all times[.]"

130239526.7

38.     Pursuant to the Second SAAS Agreement, among other things, Defendant agreed to "indemnify and hold [SIM] and its Affiliates, hotel owners, and its and their Affiliates, parents, subsidiaries, employees, officers, agents, principals, and related parties (collectively "Indemnified Parties") harmless from any loss, cost, expense (including, without limitation, reasonable attorneys' fees), property damage, interest or penalty incurred by such Indemnified Parties from any third party, employee, or taxing jurisdiction based upon [Defendant's] failure to perform the Services in accordance with applicable law or regulation (inclusive of applicable tax laws or regulations), gross negligence or willful misconduct . . . that results in any claim, penalty, interest,, cost, or expense incurred by such Indemnified Parties[.]" (hereinafter "Second Indemnity Clause").

**Defendant's Failure to Properly Prepare Paystubs and Wage Statements**

39.     Defendant prepared all of High Line's and East Village's employees' paystubs in the same manner.

40.     During the relevant period, Plaintiffs timely informed Defendant that it would be taking a tip credit towards its minimum wage obligation to certain employees and Plaintiffs timely informed Defendant which employees for whom a tip credit would be taken.  The individuals who are class members in the Nettle Action and the Rotolo Action were among the individuals for whom Plaintiff informed Defendant that it would be taking a tip credit.

41.     Despite knowing that Plaintiff were taking a tip credit towards their minimum wage obligations to the class members of the Nettle Action and the Rotolo Action, the wage statements that Defendant issued did not reference the tip credit for such individuals in a manner consistent with New York law.

42.     In March 2017, Plaintiffs informed Defendant that the tip credit was not being properly detailed on employee paystubs generated by Defendant.  At that time, Plaintiffs informed Defendants that the tip credit rate, number of hours for which a tip credit was taken, and the total tip credit taken during the pay period needed to be set forth on the paystub.

43.     In response, Defendants informed Plaintiffs that a service request would need to be inputted.  Plaintiffs thereafter promptly submitted a service request.

44.     On May 4, 2017, Defendant notified Plaintiffs that it was implementing a new "payroll feature [that] minimizes the complexities associated with federal, state, and local minimum wage laws for hourly tipped employees."

45.     Defendant assured Plaintiffs that this new tool would properly list the tip credit on wage statements of New York employees as required under New York law.

46.     Following the instructions provided by Defendant, Plaintiffs implemented Defendant's new payroll feature in May 2017; however, the tip credit was not properly listed in a manner required by New York law on the paystubs generated by Defendant after implementation of the new tool.

47.     Over the next three (3) years, Plaintiffs continued to contact Defendant, apprising Defendant of the tip credit issues on the paystubs and requesting that Defendant fix the problem. Defendant wrongly informed Plaintiffs that the matter was corrected, claimed it was not technologically feasible to do so, or asserted that the problem would be fixed shortly.

48.     In fact, it took Defendant until July 2020 when it finally configured its systems so that it would issue paystubs that complied with New York law.

**Employee Class Action Lawsuits and Plaintiffs' Demand Indemnification from Defendant**

49.     On or about January 15, 2021, Brian "Geno" Nettle and Guilherme Parreiras filed the Nettle Complaint in the Supreme Court of the State of New York, King County, bearing Index Number 501183/2021, against High Line.

50.     The Nettle Complaint alleges that High Line committed various wage and hour violations pursuant to Fair Labor Standards Act and New York Labor Law, including claims regarding the wage statements that High Line issued to Nettle and Parreiras and the class that they represent. High Line disputed these allegations and there has been no finding by any court that High Line violated the Fair Labor Standards Act or the New York Labor Law.

51.     More specifically, the plaintiffs in the Nettle Action claim that High Line failed to provide them and the class they represent with wage statements that comply with Section 195(3) of the New York Labor Law and the New York Hospitality Industry Wage Order because, among other things, the wage statements that they and members of the class received purportedly did not properly list the tip credit that High Line took towards its minimum wage obligations to such individuals.

52.     On or about July 30, 2021, Meghan Rotolo filed the Rotolo Complaint in the Supreme Court of the State of New York, King County, bearing Index Number 519116/2021, against East Village.

53.     The Rotolo Complaint alleges that East Village committed various wage and hour violations pursuant to Fair Labor Standards Act and New York Labor Law, including claims regarding the wage statements that East Village issued to Rotolo and the class that she represents. East Village disputed these allegations and there has been no finding by any court that East Village violated the Fair Labor Standards Act or the New York Labor Law.

130239526.7

54.     More specifically, the plaintiff in the Rotolo Action claim that East Village failed to provide them and the class they represent with wage statements that comply with Section 195(3) of the New York Labor Law and the New York Hospitality Industry Wage Order because, among other things, the wage statements that they and members of the class received purportedly did not properly list the tip credit that East Village took towards its minimum wage obligations to such individuals.

55.     However, prior to the filing of the Nettle Complaint and the Rotolo Complaint, the Nettle Action and Rotolo Action attorneys and Plaintiffs discussed this matter.  For example, on or about October 23, 2018, Plaintiffs received a letter from the Nettle Action and Rotolo Action attorneys.  The letter stated that the attorneys represented a number of current and former employees of The Standard Grill and Narcissa and that the attorneys had investigated The Standard Grill and Narcissa and found that the wage and hour practices at the restaurant allegedly violated the New York Labor Law ("NYLL").

56.     Later, on November 20, 2018 and December 20, 2018, the Nettle Action and Rotolo Action attorneys in clarified their allegations to allege, among other things, that Plaintiffs had failed to issue wage statements that complied with New York law to employees who worked at The Standard Grill and Narcissa for whom Plaintiffs took a tip credit towards their minimum wage obligations to such individuals.

57.     Further, on January 25, 2019, Plaintiffs and the Nettle Action and Rotolo Action attorneys executed a tolling agreement, tolling the statute of limitations effective December 10, 2018, for claims under, among other things, New York Labor Law section 195, for all employees who worked at The Standard Grill and/or Narcissa and for whom Plaintiffs took a tip credit towards its minimum wage so that the parties could investigate the allegations further.

130239526.7

58.    During this time in 2019, Plaintiffs investigated the allegations raised by the attorneys in the Nettle Action and the Rotolo Action.  Plaintiffs also exchanged documents and information with the attorneys in the Nettle Action and the Rotolo Action, including samples of the wage statements provided to employees who worked at The Standard Grill and Narcissa.

59.    On July 3, 2019, SIM sent a letter to Defendant demanding indemnity pursuant to the terms of the SAAS Agreement and Second SAAS Agreement for the wage statement issues raised by the attorneys in the Nettle Action and the Rotolo Action.  To date, Defendant has not honored its contractual obligations to indemnify Plaintiffs.

60.    In December 2019, Plaintiffs and the attorneys in the Nettle Action scheduled a mediation session through JAMS, a well-known mediation and arbitration provider, for February 13, 2020.

**Settlement with Class Action Plaintiffs in the Nettle Action**

61.    In January 2020, Plaintiffs asked Defendant if Defendant wanted to participate in the February 13, 2020 mediation.  Defendant declined to participate.

62.    In February 13, 2020, a day-long mediation session was held at JAMS' New York, New York offices with Plaintiffs and the attorneys in the Nettle Action.  The mediation was unsuccessful.

63.    Over the following months, with the assistance of JAMS, Plaintiffs and the attorneys in the Nettle Action continued to negotiate a resolution to the claims that had been asserted, including the allegation that Plaintiffs issued wage statements, which were created by Defendant, that did not comply with New York law.

64.    On November 20, 2020, the parties in the Nettle Action reached an agreement in principal to resolve the allegations asserted.

130239526.7

65.     On January 13, 2021, High Line, and Messrs. Nettle and Parreiras executed a Settlement Agreement, subject to Court approval, resolving the claims asserted (the "Settlement Agreement").  Messrs. Nettle and Parreiras executed the agreement on behalf of themselves and the class that they purported to represent, which consisted of all "servers, bussers, runners, baristas, bartenders, and barbacks employed by [High Line] at [the restaurant known as] The Standard Grill, located at 848 Washington Street, New York, New York" at any time between August 17, 2013 and November 20, 2020.  The terms of the Settlement Agreement required High Line to pay $2,250,000 plus employer-side payroll taxes.  The express terms of the Settlement Agreement allocate 60% of the settlement amount, $1,350,000 to the pay stub claims under New York Labor Law 195(3) that had been asserted.  Further, under the terms of the Settlement Agreement, all class members would release wage and hour claims under the New York Labor Law, including claims under New York Labor Law Section 195.

66.     On or about January 15, 2021, the Nettle Complaint was filed in the Supreme Court of the State of New York, King County, bearing Index Number 501183/2021.

67.     On January 19, 2021, the attorneys in the Nettle Action filed a Motion for Preliminary Approval of the Settlement Agreement.

68.     On or about May 3, 2021, Justice Devin P. Cohen certified a class for settlement purposes in the Nettle Action; the certified class consists of all "servers, bussers, runners, baristas, bartenders, and barbacks employed by [High Line] at [the restaurant known as] The Standard Grill, located at 848 Washington Street, New York, New York" at any time between August 17, 2013 and November 20, 2020.  Further, on or about May 3, 2021, Justice Cohen also preliminarily approved the Settlement Agreement, ordered that notice be provided to the aforementioned class

members apprising them of the Settlement Agreement and its terms, and set a Fairness Hearing for October 14, 2021.

69.     On September 15, 2021, the attorneys in the Nettle Action filed a Motion for Final Approval of the Settlement Agreement.

70.     On October 14, 2021, Justice Cohen held a Fairness Hearing in the Nettle Action.

71.     On October 21, 2021, Justice Cohen signed an Order approving the Settlement Agreement for all "servers, bussers, runners, baristas, bartenders, and barbacks employed by [High Line] at [the restaurant known as] The Standard Grill, located at 848 Washington Street, New York, New York" at any time between August 17, 2013 and November 20, 2020" and enjoining such individuals from pursuing and/or seeking to reopen claims that were released pursuant to the terms of the Settlement Agreement.

72.     On November 17, 2021, the Court in the Nettle Action approved a settlement agreement resolving said Action that High Line agreed to pay Nettle, Parreiras, and the class they represent $2,250,000 plus employer-side payroll taxes.   Under the terms of the settlement agreement, 60% of the settlement amount was attributed to purported violation of New York Labor Law 195(3) as asserted in the Nettle Complaint.

**Settlement with Class Action Plaintiffs in the Rotolo Action**

73.     On February 13, 2020, a day-long mediation session was held at JAMS' New York, New York offices with Plaintiffs and the attorneys in the Rotolo Action.   The mediation was unsuccessful.

74.     Over the following months, with the assistance of JAMS, Plaintiffs and the attorneys in the Rotolo Action continued to negotiate a resolution to the claims that had been

130239526.7

asserted, including the allegation that Plaintiffs issued wage statements, which were created by Defendant, that did not comply with New York law.

75.     On or about March 12, 2021, the parties in the Rotolo Action reached an agreement in principal to resolve the allegations asserted.

76.     On or about July 9, 2021, East Village, and Meghan Rotolo executed a Settlement Agreement, subject to Court approval, resolving the claims asserted (the "Settlement Agreement"). Ms. Rotolo executed the agreement on behalf of herself and the class that she purported to represent, which consisted of all "servers, bussers, runners, baristas, bartenders, and barbacks employed by [East Village] at the restaurant known as "Narcissa", located at 25 Cooper Square, New York, New York" at any time between December 10, 2012 and March 12, 2021.  The terms of the Settlement Agreement required East Village to pay $350,000 plus employer-side payroll taxes.  The express terms of the Settlement Agreement allocate 65% of the settlement amount, $227,500 to the pay stub claims under New York Labor Law 195(3) that had been asserted. Further, under the terms of the Settlement Agreement, all class members would release wage and hour claims under the New York Labor Law, including claims under New York Labor Law Section 195.

77.     On or about January 15, 2021, the Nettle Complaint was filed in the Supreme Court of the State of New York, King County, bearing Index Number 501183/2021.

78.     On or about July 30, 2021, the Rotolo Complaint was filed in the Supreme Court of the State of New York, King County, bearing Index Number 519116/2021.

79.     On or about July 30, 2021, the attorneys in the Rotolo Action filed a Motion for Preliminary Approval of the Settlement Agreement.

80. On or about November 3, 2021, Justice Ingrid Joseph certified a class for settlement purposes in the Rotolo Action; the certified class consists of all "servers, bussers, runners, baristas, bartenders, and barbacks employed by [East Village] at the restaurant known as Narcissa located at 25 Cooper Square, New York, New York" at any time between December 10, 2012 and March 12, 2021. Further, on or about November 3, 2021, Justice Joseph also preliminarily approved the Settlement Agreement. On or about December 10, 2021, Justice Joseph, ordered that notice be provided to the aforementioned class members apprising them of the Settlement Agreement and its terms, and set a Fairness Hearing for March 22, 2022.

81. On March 11, 2022, the attorneys in the Rotolo Action filed a Motion for Final Approval of the Settlement Agreement.

82. On March 22, 2022, Justice Joseph held a Fairness Hearing in the Rotolo Action.

83. On March 31, 2022, Justice Joseph signed an Order approving the Settlement Agreement and enjoining class members from pursuing and/or seeking to reopen claims that were released pursuant to the terms of the Settlement Agreement. This Order was entered with the Clerk of the Court on April 12, 2022.

**Defendant Caused Plaintiffs' Damages**

84. Defendant's services were provided in a manner that ensured that Plaintiffs would run afoul of the New York Labor Law rather than providing payroll services that complied with applicable law.

85. Defendant's preparation and issuance of wage statements to Plaintiffs' employees was done in such a way as to constitute a complete departure from minimally accepted industry standards and practice in the field of payroll services.

130239526.7

86.     Defendant's preparation and issuance of wage statements to Plaintiffs' employees was done in such a way that it did not comply with New York law as required under the SAAS Agreement and Second SAAS Agreement.

87.     Because of Defendant's breach of the SAAS Agreement and Second SAAS Agreement and/or Defendant's failure to comply with applicable federal, state, or local laws, rules or regulations, Plaintiffs have been damaged.

88.      Even if Plaintiffs' employee wage statements issued by Defendant complied with New York law (which they did not), the SAAS Agreement and Second SAAS Agreement required Defendant to indemnify Plaintiffs against allegations related to same.  Defendant has failed to do so and thus as breached the SAAS Agreement Second SAAS Agreement.

89.     Because Plaintiffs' employee wage statements issued by Defendant did not comply with New York law, the SAAS Agreement and Second SAAS Agreement require Defendant to indemnify Plaintiffs.  Defendant has failed to do so and thus as breached the SAAS Agreement Second SAAS Agreement

90.     Plaintiffs performed all their obligations pursuant to the SAAS Agreement and Second SAAS Agreement, including by compensating Defendant for the payroll services that Defendant provided to Plaintiffs.

91.     Defendant assumed responsibility and/or are responsible for the wage statements at issue in that they were compliant with New York law.

92.     Because the wage statements at issue did not comply with New York law, Defendant failed to provide payroll services in a manner that assisted Plaintiffs in complying with applicable wage and hour laws.

130239526.7

93.     Defendant knew or should have known that they had furnished non-compliant wage statements to Plaintiffs' employees.  In fact, Plaintiffs repeatedly notified Defendant of concerns that they had with the wage statements at issue as early as March 2017, yet the problem was not corrected for over three (3) years although Defendant had asserted that the problem would be corrected (or had been corrected); representations upon which Plaintiffs relied to their detriment.

94.     Thus, not only were the payroll services provided by Defendant undertaken in a manner that obstructed legal compliance with existing law, but Defendant's actions were willful and reckless.

95.     Thus, until May 2020, Defendant did not make any effort to conform the wages statements that they issued to Plaintiffs' employees to applicable law.

96.     As a result of the above, Defendant is liable to Plaintiffs for $1,577,500 plus Plaintiffs' out of pocket fees and expenses, including attorneys' fees as damages incurred by Plaintiffs as a result of the faulty wage statements at issue.

97.     Defendant's preparation of the wage statements for Plaintiffs' employees in such a manner that failed to comply with New York law significantly increased the probability that a wage and hour class and collective action lawsuit would be filed against Plaintiffs.

98.     Plaintiffs have incurred and will continue to incur substantial attorneys' fees, costs, and expenses related to the wage statement issued by Defendant that did not comply with New York law.

99.     High Line has suffered and will continue to suffer loss to its reputation and goodwill by virtue of the fact that the Nettle Action was filed against High Line on a publicly accessible docket.  Additionally, High Line has suffered and will continue to suffer premium increases in connection with the loss history of the claims underlying the Nettle Action.

130239526.7

100.     East Village has suffered and will continue to suffer loss to its reputation and goodwill by virtue of the fact that the Rotolo Action was filed against East Village on a publicly accessible docket.  Additionally, East Village has suffered and will continue to suffer premium increases in connection with the loss history of the claims underlying the Rotolo Action.

## COUNT I
## BREACH OF CONTRACT

101.     Plaintiffs incorporate each of the foregoing paragraphs 1 through 101 of this Complaint herein by reference with the same force and effect as if fully set forth at length.

102.     By virtue of the relationship created between Defendant and Plaintiffs through the SAAS Agreement and Second SAAS Agreement, Defendant owed and continues to owe a duty to Plaintiff to provide competent payroll services.

103.     One of the express purposes of the SAAS Agreement and Second SAAS Agreement is for Defendant to provide payroll services for Plaintiffs.

104.     Those payroll services include preparing and issuing legally compliant wage statements to Plaintiffs' employees.

105.     The SAAS Agreement and Second SAAS Agreement provides that Defendant is responsible for the timely and accurate processing of each payroll.

106.     The SAAS Agreement and Second SAAS Agreement further provides that Defendant's payroll services are designed to assist Plaintiffs in complying with applicable laws and government regulations.

107.     Through the actions described herein, Defendant breached the aforementioned provision of the SAAS Agreement and Second SAAS Agreement.

108.     Pursuant to the SAAS Agreement and Second SAAS Agreement, among other things, Defendant agreed that its services in a manner that complied with applicable law.

130239526.7

109.    Through the actions described herein, Defendant breached the aforementioned provision of the SAAS Agreement and Second SAAS Agreement.

110.    In addition to these express provisions, by virtue of the SAAS Agreement and Second SAAS Agreement, Defendant is bound by an implied duty of good faith and fair dealing.

111.    Plaintiffs understood and reasonably expected that Defendant's contracted-for services would be designed to comply with applicable law and, in fact, would comply with applicable law, especially when Defendant continued to make representations that the matter was fixed or would be fixed shortly.

112.    The SAAS Agreement and Second SAAS Agreement constitutes a valid and enforceable contract between Plaintiffs and Defendant.

113.    Plaintiffs have fulfilled all of its obligations under the terms of the SAAS Agreement and Second SAAS Agreement.

114.    As a direct consequence of Defendant's egregious failure to perform its contractual obligations in rendering payroll services, specifically in its failure to issue paystubs that complied with New York law, Plaintiffs have been damaged in an amount of $1,577,500 plus their costs and expenses, including their attorneys' fees.

115.    As a direct consequence of Defendant's willful breach of the SAAS Agreement and Second SAAS Agreement and/or the implied covenant of good faith and fair dealing that is inherent in every contract through the aforesaid actions, including, but not limited to, by failing to design its wage statements in compliance with applicable legal and regulatory requirements and by failing to follow Plaintiffs' instructions to design wage statements in compliance with applicable legal and regulatory requirements.

21

116.    As detailed above, Defendant failed to perform its contractual obligations according to the minimum standards required by accepted custom and practice in payroll provider services in New York State.

117.    The damages that Plaintiffs have incurred as a result of Defendant's failure to issue wage statements compliant with New York law is a direct consequence of Defendant's breach of the SAAS Agreement and Second SAAS Agreement due to Defendant's reckless misconduct or gross negligence.

118.    It was reasonably foreseeable to Defendant, at the time of accepting the contractual obligations it undertook to perform for Plaintiffs, that the type of damages sustained by Plaintiffs as detailed above would, in fact, be sustained as a result of a prospective failure to perform its contractual obligations competently.

119.    The magnitude of the damages sustained by Plaintiff as detailed above was reasonably and readily foreseeable to Defendant at the time it undertook to provide payroll services and issue wage statements to Plaintiffs' employees.

120.    Defendant's alleged failure to perform its contractual obligations proximately caused the allegations asserted in the Nettle Complaint and the Rotolo Complaint regarding the wage statements were issued to class members in the classes certified in the Nettle Action and the Rotolo Action.

121.    Defendant's alleged failure to perform its contractual obligations rendered it exponentially more likely that a wage and hour class and collective action would be filed against Plaintiffs.

122.    Through the aforementioned actions set forth herein, Defendant failed to provide Plaintiffs the services for which it contracted and therefore Plaintiffs are entitled to recover the

130239526.7

amount Plaintiffs has paid Defendant pursuant to the SAAS Agreement and Second SAAS Agreement in addition to other damages it has incurred.

123.    As a result of Defendant's breach of the SAAS Agreement and Second SAAS Agreement and/or the implied covenant of good faith and fair dealing that is inherent in every contract, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT II**
**CONTRACTUAL INDEMNIFICATION**

124.    Plaintiffs incorporate each of the foregoing paragraphs 1 through 123 of this Complaint herein by reference with the same force and effect as if fully set forth at length.

125.    Under the terms of the SAAS Agreement and Second SAAS Agreement, Defendant must indemnify Plaintiffs for any losses, costs, and expenses Plaintiffs may suffer as a result of the allegations asserted in the Nettle Action concerning the failure to provide Plaintiffs' employees wage statements that comply with New York law.

126.    Despite Defendant's agreement to indemnify and hold Plaintiff harmless from all liabilities, losses, costs and expenses, Defendant has refused to indemnify Plaintiffs for its actual losses, including attorneys' fees incurred, in defending against the allegations raised by the Nettle Action and Rotolo Action attorneys as well as any future losses, costs, and expenses that Plaintiffs may incur as a result of the Nettle Action and the Rotolo Action.

127.    In the Nettle Action, SIM's and High Line's damages to date include 60% of the settlement amount set forth in the Settlement Agreement, $1,350,000, as well as the costs and legal fees that SIM and High Line has expended defending the claims in asserted in the Nettle Action. Defendant has not reimbursed Plaintiffs for any such damages, losses, fees or costs despite Defendant's contractual obligation to do so.

130239526.7

128.    In the Rotolo Action, SIM's and East Village's damages to date include 65% of the settlement amount set forth in the Settlement Agreement, $227,500, as well as the costs and legal fees that SIM and East Village has expended defending the claims in asserted in the Rotolo Action. Defendant has not reimbursed Plaintiffs for any such damages, losses, fees or costs despite Defendant's contractual obligation to do so

129.    Plaintiffs provided notice to Defendant of the allegations that were later asserted in the Nettle Action and the Rotolo Action concerning the wage statements at issue and gave Defendant an opportunity to challenge such assertions concerning the wage statements at issue, including inviting Defendant to participate in a mediation with the attorneys in the Nettle Action and the Rotolo Action, but Defendant declined such opportunity expressly and through their course of conduct.

130.    Accordingly, Defendant is entitled to specific performance of the Indemnity Clause and the Second Indemnity Clause set forth in the SAAS Agreement and Second SAAS Agreement and/or damages in an amount to be determined at trial.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) with respect to every issue in the within controversy that is so justiciable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully requests that this Honorable Court enter judgment in its favor and against Defendant as follows:

(A)    In an amount to be determined at trial but for no less than $1,577,500 plus its out-of-pocket costs, expenses and fees incurred, including attorneys' fees;

130239526.7

(B)     In an amount to be determined, any amounts Plaintiffs paid to Defendant pursuant to their agreements with Plaintiffs that Plaintiffs are entitled to recover because of the Defendants' breach of such agreements;

(C)     In an amount to be determined to offset the legal fees necessary to reduce Plaintiffs claims against the Defendants to judgment and/or payment;

(D)     In an amount necessary to offset future insurance premium increases as a result of the loss run(s) created by the Nettle Action against High Line and the underlying claims and events;

(E)     In an amount necessary to offset future insurance premium increases as a result of the loss run(s) created by the Rotolo Action against East Village and the underlying claims and events;

(F)     In an amount sufficient to compensate High Line for the loss of goodwill and business reputation in connection with the claims against High Line in the Nettle Action being permanently placed upon a public docket;

(G)     In an amount sufficient to compensate East Village for the loss of goodwill and business reputation in connection with the claims against East Village in the Rotolo Action being permanently placed upon a public docket;

(H)     Plaintiffs' reasonable attorneys' fees incurred in brining and prosecuting this action pursuant to the terms of the SAAS Agreement and Second SAAS Agreement;

(I)     Interest upon all such damages awarded at trial;

(J)     Such other relief as may be necessary to make Plaintiffs whole; and

(K)     Together with such other relief as may be fitting and proper in the judgment of this Court.

Dated:  New York, New York
        May 17, 2022

FOX ROTHSCHILD LLP

By: */s/ Ernest Edward Badway*
    Carolyn D. Richmond, Esq.
    Ernest Edward Badway, Esq.
    Glenn S. Grindlinger, Esq.
    101 Park Avenue, Suite 1700
    New York, New York 10178
    Telephone: (212) 878-7900
    Facsimile: (212) 692-0940
    *Attorneys for Plaintiffs*

130239526.7